UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 03-21946 CIV-SEITZ/BANDSTRA

NIGHT BOX
FILED

OCT - 4 2004

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

LUIS BETTELLA,

Plaintiff,

vs.

DEPARTMENT OF OFF-STREET PARKING OF THE CITY OF MIAMI, d/b/a MIAMI PARKING AUTHORITY,

Defendant.
_______________________________/

**DEFENDANT, DEPARTMENT OF OFF-STREET PARKING OF THE CITY OF MIAMI d/b/a MIAMI PARKING AUTHORITY'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW**

Defendant, DEPARTMENT OF OFF-STREET PARKING OF THE CITY OF MIAMI, d/b/a MIAMI PARKING AUTHORITY ("Miami Parking Authority"), by and through its undersigned attorneys, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby files its Motion for Summary Judgment and Supporting Memorandum of Law and states:

## I. PRELIMINARY STATEMENT

Plaintiff's Complaint purports to allege a cause of action against Miami Parking Authority under the Americans with Disabilities Act, 42 U.S.C. § 12111, et seq. ("ADA"). As set forth in more detail below, summary judgment in this case is appropriate, because Plaintiff has not established a *prima facie* claim under the ADA, and there exist no material

issues of fact to be tried to a jury, as (1) Plaintiff is not disabled; (2) Plaintiff is not qualified to perform the essential functions of his job due to his excessive absences; and (3) Plaintiff was not subjected to unlawful discrimination because of any alleged disability or perceived disability.

## II. STATEMENT OF UNDISPUTED FACTS

1. Plaintiff was hired on or about December 12, 1989 by Miami Parking Authority as a cashier at a parking facility on Biscayne Boulevard in Miami. (Bettella 52:7-24; 53:1-5; Exhibit "A"; Exhibit "B").

2. Several months later, Plaintiff applied for and was given a parking enforcement position. (Bettella 54:15-19; Exhibit "A"; Exhibit "B").

3. Plaintiff then received training and became certified as a parking enforcement officer and passed the written examination. As a parking enforcement officer, Plaintiff was required to patrol the streets and patrol the areas that he was assigned. He was to check for vehicles with meters expired and cite them and to call a tow truck if necessary. (Bettella 57:18-23).

4. At all times material hereto, Miami Parking Authority had a written discrimination policy in place which prohibited discrimination or retaliation against any employees because of their race, religion, color, sex, age, national origin, disability and marital or veteran status. (Exhibit "B"; Exhibit "C"). Plaintiff was aware of the policy. (Betella 67:10-13).

5. At all times material hereto, Miami Parking Authority had a sick leave policy, pursuant to which unauthorized absences could lead to disciplinary action, up to and including termination. Pursuant to the policy, any employee taking three (3) consecutive work days or more sick leave must submit documentation acceptable to the Miami Parking Authority. (Bettella 141:21-25; 142: 1-4; 151:1-5; Exhibit "B"; Exhibit "D").

6. On November 15, 2000, Plaintiff reported that he was injured on the job when a vehicle backed into him causing his right knee to be twisted. Plaintiff was cleared to return to work the following day. Plaintiff subsequently underwent rehabilitation in February 2001 and was released again to work full duty on March 30, 2001. During the time that Plaintiff was released to work with restrictions, Miami Parking Authority accommodated those restrictions and complied with the instructions of Mr. Bettella's physicians. (Bettella 85:11-22; 88:4-9; 97:7-25; 98:25; 99:1-3; Exhibit "A"; Exhibit "B").

7. From April 2001 to August 2001, Plaintiff did not request any light duty work or request any accommodations arising out of any injuries he sustained in the incident in November 2000. (Bettella 100:6-19; Exhibit "A").

8. On August 7, 2001, Plaintiff reported that he was involved in another on the job incident in which an individual kicked him causing him to fall to the ground. Plaintiff was released on light duty. (Bettella 102-105; Exhibit "A"). Plaintiff submitted documents from his physician indicating that he could return to work on August 27, 2001. On August 28, 2001, Plaintiff's physician prepared another document indicating that Plaintiff could return to work on September 5, 2001 on light duty. (Bettella 110:21-25; 111:1-2; Exhibit



LAW OFFICES OF
STEVEN M. ZIEGLER, P.A.
4000 HOLLYWOOD BOULEVARD • SUITE 375 SOUTH • HOLLYWOOD FLORIDA 33021 • TELEPHONE (954) 986-2898

"A"). On September 7, 2001, Plaintiff was advised that he could drive non-commercial vehicles. At all times material hereto, Plaintiff was provided a Cavalier automobile with automatic transmission to use for work. (Bettella 114:5-21; Exhibit "A").

9. Plaintiff then initiated physical therapy. During that time, Miami Parking Authority provided Plaintiff with light duty work in accordance with his physician's instructions. Specifically, Plaintiff was given work in the office and not required to work as a parking enforcement officer in the field during that period of time. (Exhibit "A").

10. In October 2001, Plaintiff provided a note from his physician that Plaintiff should minimize exposure to dust and mold due to an allergy. (Bettella 119:22-25; 120:1-8; Exhibit "A"). Prior to that time, Plaintiff indicated that he was sensitive to smoke and did not want to work next to individuals who smoked tobacco. Miami Parking Authority honored these requests. (Exhibit "A").

11. On November 7, 2001, Plaintiff underwent successful arthroscopic knee surgery and was released on November 29, 2001 to light duty. (Bettella 123:8-25; 124:1-23; 133:23-25; Exhibit "A"; Exhibit "F"). Miami Parking Authority provided Plaintiff with light duty in accordance with his physician's instructions. On December 24, 2001, Plaintiff was released to work with other restrictions, which did not limit his ability to perform his job. His physician indicated that he could drive. (Exhibit "A"; Exhibit "F").

12. At Plaintiff's request, he was then permitted to recuperate at home. He was released by his orthopedic physician, Dr. Michael Reilly, with no restrictions on January 17, 2002. (Bettella 126:21-24; 134:1-4; Exhibit"A"; Exhibit "F"). On February 7, 2002,

Plaintiff obtained a second opinion from another orthopedic physician, Dr. Richard Kleiman, who also indicated that Plaintiff was able to return to work with no restrictions. (Bettella 138:22-25; 139-140; Exhibit "A").

13. At no time after returning to full duty status in January 2002, did Plaintiff provide Miami Parking Authority with any written certification from any physician that he could not continue to work without restrictions or limitations. Additionally, at no time thereafter did Plaintiff request any accommodations from Miami Parking Authority. ("Exhibit "A"; Exhibit "B").

14. Plaintiff's regular attendance was an essential function of his job. (Exhibit "B"). On February 20, 2002, Plaintiff received verbal counseling from his supervisor regarding excessive absenteeism following his return to work on full duty status. Plaintiff called in sick eight (8) times following his return to full duty. Even after counseling, Plaintiff missed the next two (2) days and then brought in a physicians note excusing him to be out of work until March 10, 2002. On March 16, 2002, Plaintiff called in sick again. Plaintiff had been out thirteen (13) days following being counseled on this issue. Plaintiff was advised that excessive absenteeism would result in further disciplinary action, including termination. (Battella 142:12-25; 143:1-10144:14-25; 145:1-17; Exhibit "B"; Exhibit "G").

15. Plaintiff continued to violate the sick leave policy and received a written warning for excessive absenteeism on March 25, 2002. Plaintiff was suspended for three (3) days without pay and was again advised that excessive absenteeism would result in

disciplinary action, up to and including termination. (Bettella 147:22-25; 148-149; Exhibit "B"; Exhibit "Exhibit "H").

16. As of March 24, 2002, Plaintiff had missed over fifteen (15) days and also missed two (2) days without calling his immediate supervisor in violation of the sick leave policy. (Exhibit"B"; Exhibit "I").

17. As a result of Plaintiff's failure and/or refusal to comply with the sick leave policy, Plaintiff was terminated on April 22, 2002. (Bettella 159:21-25; 160:1-5; Exhibit "B"; Exhibit "I").

18. On October 7, 2002, Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") alleging that he was discriminated against by Miami Parking Authority for his alleged disability or perceived disability. (Bettella: 185; Exhibit "J"). On April 25, 2003, the EEOC dismissed Plaintiff's Charge of Discrimination stating that Plaintiff's "allegations did not involve a disability as defined by the Americans with Disabilities Act." (Bettella 189:23-24; 190:1-10; Exhibit "K").

## III. MEMORANDUM OF LAW

### A. SUMMARY JUDGMENT IN FAVOR OF MIAMI PARKING AUTHORITY IS APPROPRIATE

Summary judgment is mandated when a plaintiff fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The Eleventh Circuit Court of Appeals has recognized that the summary judgment

procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action. Earley v. Champion International Corp., 907 F. 2d 1077, 1080 (11th Cir. 1990). The Earley court further stated that "summary judgments for defendants are not rare in employment discrimination cases" and if plaintiff has failed to carry his/or her burden of proof by offering evidence that is "merely colorable, or is not merely significantly probative, then summary judgment may be granted." Id. at 1080-1081. Pace v. Southern Railway System, 701 F. 2d 1383, 1391 (11th Cir. 1983)(a defendant in an employment discrimination case is entitled to summary judgment if the Plaintiff has failed to establish a *prima facie* case.)

**B. PLAINTIFF HAS NOT ESTABLISHED A PRIMA FACIE CASE UNDER THE ADA**

In support of his claim against Miami Parking Authority, Plaintiff has alleged that he was a qualified individual with a disability and that he requested and that Miami Parking Authority failed to provide him with reasonable accommodations. Plaintiff contends that Miami Parking Authority discriminated against Plaintiff in violation of the ADA. To establish a *prima facie* case of disability discrimination under the ADA, Plaintiff must establish **all** of the following: (1) he is disabled; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability. Wood v. Green, 323 F. 2d 1309, 1312 (11th Cir. 2003); Cash v. Smith, 231 F. 3d 1301, 1305 (11th Cir. 2000); Swain v. Hillsborough County School Board, 146 F.3d 855 (11th Cir. 1998); Mont-Ros v.

City of West Miami, 111 F.Supp. 3d 1338 (S.D. Fla. 2000); Schwertfager v. City of Boynton Beach, 42 F. Supp. 2d 1347 (S.D. Fla. 1999).

**1. Plaintiff Is Not Disabled Under The ADA**

In order to satisfy the first element of Plaintiff's *prima facie* case, Plaintiff must establish that he is disabled. The ADA defines "disability" as "(A) physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Merely having a physical impairment is not sufficient to be covered by the ADA. Schwertfager v. City of Boynton Beach, supra at 1357-1358. According to the Supreme Court, when considering whether or not a plaintiff has the physical or mental impairment that substantially limits one or more of the major life activities, this Court must first determine whether Plaintiff has an impairment, and next, must identify the life activity upon which Plaintiff relies and determine whether it constitutes a major life activity under the ADA. Finally, this Court must then determine whether the impairment substantially limits Plaintiff's asserted major life activity. The determination of whether a claimed impairment constitutes a disability and whether an identified endeavor constitutes a major life activity under the ADA are questions for the Court. See Bragdon v. Abbott, 524 U.S. 624, 118 S. Ct. 2196, 2202, 141 L. Ed. 2d 540 (1998); Schwertfager v. City of Boynton Beach, supra at 1358.

**A. Plaintiff Does Not Have An Impairment Which Substantially Limits One Or More Of His Major Life Activities.**

Because the ADA does not define "impairment", courts look to the EEOC regulations for guidance, which define a physical of mental impairment as:

(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, heroic and lymphatic, skin, and endocrine; or

(2) Any mental or physical disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2 (h).

Similarly, the ADA does not define "major life activities" and "substantial limitations." Courts look to the EEOC regulations to assess whether a physical impairment actual limits life activity. The regulations define "substantially limit " as rendering an individual "[u]nable to perform a major life activity that the average person in the general population can perform" or [s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. §§ 1630.2(j)(1)(i), (ii). The regulations also identify three additional factors to be considered: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent and long term impact of the expected permanent and/or long term impact resulting from the impairment. 29 C.F.R. § 1630.2(j)(2). It is important to note that in this case, the EEOC determined that Plaintiff's **"allegations did not involve a disability as**



LAW OFFICES OF
STEVEN M. ZIEGLER, P.A.
4000 HOLLYWOOD BOULEVARD • SUITE 375 SOUTH • HOLLYWOOD FLORIDA 33021 • TELEPHONE (954) 966-2696

**defined by the Americans with Disabilities Act."** (Bettella 189:23-24; 190:1-10; Exhibit "K" (emphasis added)).

In his Complaint, Plaintiff alleges only that he was suffering from "a serious injury to his knee" and a "chronic respiratory illness." (Complaint at Paragraph 15). Plaintiff fails to allege how the claimed impairment affected him. See Ennis v. National Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55,60 (4th Cir. 1995) (HIV and other sicknesses not *per se* disabilities; courts must rely upon specific evidence showing how the disease affected the plaintiff's daily activities). An illness may not qualify as a disability under the ADA even if the disease is life threatening. See Ellison v. Software Spectrum, Inc., 85 F. 3d 187, 190 (5th Cir. 1996) (breast cancer requiring chemotherapy and treatment, resulting in significant side effects, not a disability under the ADA); Schwertfager v. City of Boynton Beach, supra.

In Schwertfager, supra, the plaintiff, a former city employee, who had breast cancer and reconstructive surgery, brought an action against the city alleging violations of the ADA. The Southern District of Florida held that the plaintiff did not establish that she was disabled within the meaning of the ADA. In that case, the plaintiff identified her disability as having contracted breast cancer and the resulting surgery she underwent to cosmetically repair her appearance. The court noted that not every illness qualifies for an ADA disability, even if the disease if life threatening. Id. at 1359. The court also noted that the fact that the plaintiff's surgery caused temporary limitations on her ability to perform daily and routine functions is not determinative. Specifically, the court found no evidence that the plaintiff was incapacitated either at work or in her daily activities. The court noted that



LAW OFFICES OF
STEVEN M. ZIEGLER, P.A.
4000 HOLLYWOOD BOULEVARD • SUITE 375 SOUTH • HOLLYWOOD FLORIDA 33021 • TELEPHONE (954) 966-2698

the plaintiff did not present any evidence that she reported to the hospital on a daily basis or any evidence of her own testimony that she was unable to perform the daily activities herself. The court also noted that the plaintiff failed to establish that she suffered from any substantially limiting impairment of a significant duration. The court stated that temporary impairments have not been held to qualify as disabilities. Id. at 1360. The court acknowledged that [p]ermanency ... is a touchstone of a substantial limiting impairment." Id. (quoting Burch v. Coca Cola Co., 119 F. 3d 305, 206 (5th Cir. 1997). Additionally, the court referred to the applicable regulations, which state that "temporary impairments of short duration, with little or no long term permanent impact, are usually not disabilities." Id.; 29 F. C. R. § 1630.2(j), App. Having determined that the plaintiff failed to establish a disability under the ADA, the court granted the defendant's motion for summary judgment.

Like the plaintiff in Schwertfager, Plaintiff in this case has not established that he was disabled within the meaning of the ADA. The undisputed evidence in this case establishes that Plaintiff sustained an injury to his right knee in two work related incidents in November 2000 and in August 2001. With respect to the first incident, on November 15, 2000,Plaintiff reported that he was injured on the job when a vehicle backed into him causing his right knee to be twisted. Plaintiff was cleared to return to work the following day, without restrictions. Plaintiff subsequently underwent rehabilitation in February 2001 and was released again to work full duty on March 30, 2001. (Bettella 85:11-22; 88:4-9; 97:7-25; 98:25; 99:1-3; Exhibit "A"; Exhibit "B") From April 2001 to August 2001, Plaintiff did not

request any light duty work or request any accommodations arising out of any injuries he sustained in the incident in November 2000. (Bettella 100:6-19; Exhibit "A").

With respect to the second incident, on August 7, 2001, Plaintiff reported that he was involved in another on the job incident in which an individual kicked him causing him to fall to the ground. Plaintiff was released on light duty. (Bettella 102-105; Exhibit "A"). Plaintiff submitted documents from his physician indicating that he could return to work on August 27, 2001. On August 28, 2001, Plaintiff's physician prepared another document indicating that Plaintiff could return to work on September 5, 2001 on light duty. (Bettella 110:21-25; 111:1-2; Exhibit "A"). On September 7, 2001, Plaintiff was advised that he could drive non-commercial vehicles. At all times material hereto, Plaintiff was provided a Cavalier automobile with automatic transmission to use for work. (Bettella 114:5-21; Exhibit "A"). Plaintiff then initiated physical therapy.

On November 7, 2001, Plaintiff underwent successful arthroscopic knee surgery and was released on November 29, 2001 to light duty. (Bettella 123:8-25; 124:1-23; 133:23-25; Exhibit "A"; Exhibit "F"). Miami Parking Authority provided Plaintiff with light duty in accordance with his physician's instructions. On December 24, 2001, Plaintiff was released to work with other restrictions, which did not limit his ability to perform his job. His physician indicated that he could drive. (Exhibit "A"; Exhibit "F"). At Plaintiff's request, he was then permitted to recuperate at home. Plaintiff was released by his orthopedic physician, Dr. Michael Reilly, with no restrictions on January 17, 2002. (Bettella 126:21-24; 134:1-4; Exhibit"A"; Exhibit "F"). On February 7, 2002, Plaintiff

obtained a second opinion from another orthopedic physician, Dr. Richard Kleiman, who also indicated that Plaintiff was able to return to work with no restrictions. (Bettella 138:22-25; 139-140; Exhibit "A"). At no time after returning to full duty status in January 2002, did Plaintiff provide Miami Parking Authority with any written certification from any physician that he could not continue to work without restrictions or limitations. ("Exhibit "A"; Exhibit "B").

Like the plaintiff in Schwertfager, Plaintiff in this case has failed to offer any evidence that, as a result of his alleged medical condition, Plaintiff suffered from any substantially limiting impairment of a significant duration. In fact, the undisputed evidence, through the actions of Plaintiff's own treating orthopedic surgeon and another orthopedic surgeon who offered a second opinion, establishes that Plaintiff sustained a right knee injury for which Plaintiff underwent successful rehabilitation and surgery, which allowed Plaintiff to return to work on full duty status in January 2002. Additionally, with respect to Plaintiff's allegations regarding a "respiratory illness," Plaintiff provided a note from his physician in October 2001 stating that Plaintiff should minimize exposure to dust and mold due to an allergy. (Bettella 119:22-25; 120:1-8; Exhibit "A"). Prior to that time, Mr. Bettella indicated that he was sensitive to smoke and did not want to work next to individuals who smoked tobacco. Miami Parking Authority honored these requests, which did not involve any substantially limiting impairment of a significant duration. (Exhibit "A"). See also Bearelly v. State of Florida, 2002 WL 400779(M.D. Fla. January 14, 2002);

Mont-Ros v. City of North Miami, supra; Rivera v. Orange County School Board, 2000 WL 33176009 (M.D. Fla. May 2, 2000).

**B. Plaintiff Has Not Established A Record Of Disability.**

Plaintiff has not produced any evidence that Miami Parking Authority relied on such a record of a substantially limiting impairment. In fact, the evidence in the record establishes that at no time did anyone at Miami Parking Authority perceive Plaintiff as having a disability, which substantially limited his ability to perform his job functions. The documents reflect that every effort was made to get Plaintiff back to work following his release by his physicians to full duty status. (Exhibit "A'; Exhibit "B"; Exhibit "G"; Exhibit "H").

**C. Plaintiff Has Not Established That Miami Parking Authority "Regarded" Him As Disabled.**

Pursuant to the ADA, a person is regarded as disabled where he: (1) has a physical or mental impairment that does not substantially limit major life activities but is treated by his employer as constituting such limitations; (2) has a physical or mental impairment which substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (3) has no illness or malady defined by the EEOC as a physical or mental impairment but is treated by his employer as having a substantially limiting impairment. The perceived impairment must be substantially limiting and significant and must be "viewed by the employer as generally foreclosing the type of employment involved and not just a narrow range of job tasks." See 29 C.F.R. §1630.2(l);



LAW OFFICES OF
STEVEN M. ZIEGLER, P.A.
4000 HOLLYWOOD BOULEVARD • SUITE 375 SOUTH • HOLLYWOOD FLORIDA 33021 • TELEPHONE (954) 966-2696

Schwertfager, supra, at 1360–1361, (quoting Gordon v. L. Hamm and Assoc., 100 F 3d 907, 913 (11th Cir. 1996), cert. denied, 522 U.S. 1030, 118 S. Ct. 630, 139 L. Ed. 2d 610 (1997).

Plaintiff merely alleges in the Complaint that Miami Parking Authority "perceived" him as an individual with a disability. (Complaint at Paragraph 14). Plaintiff has come forward with no evidence substantiating any claim that Miami Parking Authority regarded him as disabled. The only evidence in this case is that the Miami Parking Authority was aware of Plaintiff's worker's compensation claims arising out of the two work related incidents. Plaintiff's deposition testimony and the undisputed evidence in this case has not established any probative evidence that Miami Parking Authority acted upon any perception that Plaintiff was disabled. To the contrary, the uncontroverted evidence in this case establishes that Miami Parking Authority did not regard Plaintiff as disabled and that Miami Parking Authority made every effort to get Plaintiff back to work after his physicians had cleared him to return to work on a full duty basis. As set forth in more detail below, it was Plaintiff's repeated violations of Miami Parking Authority's sick leave policy, which resulted in Plaintiff's termination. The evidence shows that Plaintiff's termination had nothing to do with any perceived disability on the part of Plaintiff. The court in Schwertfager, faced with similar facts, asserted:

> Credible evidence in the record demonstrates that the City expected Schwertfager to fulfill her job requirements *because* her supervisors believed Schwertfager had recovered from any limitations which she had formerly asserted and for which she was provided leave. Schwertfager has testified that her doctors advised her to return to work without restriction...



LAW OFFICES OF
STEVEN M. ZIEGLER, P.A.
4000 HOLLYWOOD BOULEVARD • SUITE 375 SOUTH • HOLLYWOOD FLORIDA 33021 • TELEPHONE (954) 986-2896

Schwertfager v. City of Boynton Beach, 42 F. Supp. 2d at 1361.

Based upon the foregoing, and since Plaintiff has failed to establish that he is disabled, that he has record of disability, or that Miami Parking Authority perceived him as being disabled, Plaintiff has failed to satisfy the first element of a *prima facie* case under the ADA. For this reason alone, summary judgment in favor of Miami Parking Authority is warranted.

**2. Plaintiff Was Not Qualified To Perform The Essential Functions of His Job, With Or Without A Reasonable Accommodation.**

Plaintiff also cannot satisfy the second prong of his *prima facie* case, as he was not qualified to perform the essential functions of his job, with or without a reasonable accommodation. Plaintiff has taken the position in this case that he could not perform all of the essential functions of the position. (Bettella 137:6-25). Additionally, Plaintiff's failure and/or refusal to adhere to Miami Parking Authority's sick leave policy is fatal to Plaintiff's attempts to establish that he was qualified under the ADA. It is axiomatic that employees must be "able to meet all of a [job]'s requirements in spite of [a disability]". Schwertfager v. City of Boynton Beach, supra, 42 F. Supp. 2d at 1362, (quoting Southeastern Community College v. Davis, 442 U.S. 397, 406, 99 S. Ct. 2361, 2367, 60 L. Ed. 2d 980 (1979). Additionally, courts have repeatedly held that the "ability to appear for work . . . and to complete an assigned task within a reasonable period of time" is essential to any job. Hernandez v. Wilsonart International, Inc., 2000 WL 33146761 (S.D. Fla. November 22, 2000) (plaintiff who continued to require time off and not qualified under

the ADA fails to establish prima facie case under the Act); Rogers v. International Marine Terminals, Inc., 87 F. 3d 755, 759 (5th Cir. 1996) (quoting Carr v. Reno, 23 F. 3d 525, 530 (D.C. Cir. 1994); Tyndall v. National Educ. Centers, Inc., 31 F. 3d 209, 213 (4th Cir. 1974) ("An employee who does not come to work cannot perform any of his job functions, essential or otherwise.") Additionally, regular and predictable attendance is an especially central function of a government job. *See* Carr v. Reno, supra at 530 ("an essential function of any government job is an ability to appear for work"); Law v. United States Postal Serv., 852 F. 2d 1278, 1279-80. (Fed. Cir. 1988) ("an agency is inherently entitled to require an employee to be present during scheduled work times... an employee's absence [can be] disruptive to the agency's efficient operation"); Schwertfager v. City of Boynton Beach, 42 F. Supp. 2d at 1362;

It is clear that Miami Parking Authority considered attendance to be an essential function of Plaintiff's position. (Exhibit "B"; Exhibit "G"; Exhibit H"; Exhibit "I"). On February 20, 2002, Plaintiff was verbally counseled for his excessive absenteeism, relating to Plaintiff calling in sick eight (8) times after his return to work on full duty status. Even after being counseled, Plaintiff was out another thirteen (13) times. On March 20, 2002, Plaintiff's supervisor sent him a memorandum regarding his excessive absenteeism and advised Plaintiff that should an incident of this nature occur in the future, further disciplinary action would be taken, including termination. (Exhibit "B"; Exhibit "G"). Plaintiff ignored the verbal counseling and received a written warning on March 25,2002 after Plaintiff continued to call in sick in violation of the sick policy. Plaintiff was advised

that his continuous absenteeism constitutes unsatisfactory performance. Plaintiff received a written disciplinary action along with three (3) days suspension without pay for excessive absenteeism and was advised that further disciplinary action would take place, up to and including termination for continued violations. (Exhibit "H"). Plaintiff was ultimately terminated for excessive absenteeism, which rendered Plaintiff unqualified to perform the essential functions of his job. (Exhibit "B"; Exhibit "I").

Based upon the foregoing, Plaintiff has failed to establish the second prong of his *prima facie* case, and for this reason alone, summary judgment in favor of Miami Parking Authority is warranted.

3. **Miami Parking Authority Did Not Unlawfully Discriminate Against Plaintiff Because of Any Alleged Disability.**

Plaintiff has also failed to establish that Miami Parking Authority unlawfully discriminated against him because of any alleged disability. At all material times, Miami Parking Authority had a discrimination policy, which prohibits discrimination against any employee due to a disability. (Exhibit "B"; Exhibit "C"). Plaintiff was aware of the policy. (Betella 67:10-13). The evidence in this case establishes that Miami Parking Authority consistently followed the instructions of Plaintiff's physicians arising out of his right knee injury and respiratory condition, as identified by Plaintiff's physician in October 2001. Miami Parking Authority placed Plaintiff on light duty work as instructed by his physician and also allowed Plaintiff to recuperate at home, even though his physician had indicated he could return to work. (Exhibit "A"; Exhibit "B").

The Eleventh Circuit has held that the scope of an employer's duty to reasonably accommodate a disabled employee is not triggered unless an employee specifically demands an accommodation. Gatson v. Bellingrath Gardens & Home, Inc., 1999 WL 68111, at *2-3 (11th Cir. February 12, 1999). Additionally, a plaintiff bears the burden to identify the accommodation that would allow him to perform the job and bears the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable. Stewart v. Happy Herman's Chesire Bridge, Inc., 117 F. 3d 1278, 1286 (11th Cir. 1997). In this case, Plaintiff has failed to meet this burden. With respect to the first incident in November 2000, Plaintiff was released to work full duty on March 30, 2001 and requested no accommodations from April 2001 until the second incident in August 2001. Additionally, after Plaintiff was released to work full duty on January 2002, Plaintiff did not request any accommodations and did not present Miami Parking Authority with any written certification from a physician indicating that he could not continue to work without restrictions or limitations. (Exhibit "A"; Exhibit "B"). Accordingly, Miami Parking Authority did not have any duty to provide Plaintiff with any additional accommodations as a matter of law.

The uncontroverted evidence in this case shows that Miami Parking Authority's decision to terminate Plaintiff's employment was legitimate and non discriminatory. The decision came after an extensive number of absences and after Plaintiff received verbal and written warnings that his continued absenteeism, in violation of the sick leave policy, would result in his termination. The termination was a direct result of Plaintiff's own

conduct and not due to any alleged disability. In fact, as stated above, Miami Parking Authority made every effort to get Plaintiff back to work after his physicians had cleared him to return to work on a full duty basis. At no time did Miami Parking Authority discriminate against Plaintiff due to any medical condition or alleged disability.

Based on the foregoing, Plaintiff has failed to establish the third prong of his *prima facie* case, and for this reason alone, summary judgment in favor of Miami Parking Authority is warranted.

## IV. CONCLUSION

Because Plaintiff has failed to establish the requisite elements of his *prima facie* case against Miami Parking Authority under the ADA as a matter of law, Miami Parking Authority respectfully requests that this Court enter its Order granting summary judgment in its favor, together with its attorney's fees and costs, along with such other and further relief as this Court deems just and proper.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by mail this 4th day of October, 2004 to: **TERI GUTTMAN VALDES**, ESQUIRE, Teri Guttman Valdes, P.A., 1550 Madruga Avenue, Kendar Executive Center, Suite 323, Coral Gables, FL 33146.

Respectfully submitted,

Law Offices of
STEVEN M. ZIEGLER, P.A.
Attorneys for Defendant

4000 Hollywood Boulevard
Presidential Circle – Suite 375 South
Hollywood, Florida 33021
Tel.: (954) 966-2696
Fax: (954) 966-2446

By: ______________________
ARTHUR CHOLODOFSKY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 03-21946 CIV-SEITZ/BANDSTRA

LUIS BETTELLA,

Plaintiff,

vs.

DEPARTMENT OF OFF-STREET PARKING OF THE CITY OF MIAMI, d/b/a MIAMI PARKING AUTHORITY,

Defendant.
_______________________________/

**AFFIDAVIT OF SOCORRO PEREZ**

**STATE OF FLORIDA )**
**) SS**
**COUNTY OF MIAMI-DADE)**

BEFORE ME, an officer duly authorized to take oaths and administer acknowledgements, personally appeared, SOCORRO PEREZ, who, after first being duly sworn, did depose and say:

1. My name is Socorro Perez. I am over the age of eighteen (18) years and I am competent to make this Affidavit.

2. At all times material hereto, I was employed by the Department of Off Street Parking for the City of Miami d/b/a Miami Parking Authority (" Miami Parking Authority") as Human Resources Specialist.

3. I have knowledge regarding the employment and worker' s compensation claims brought by Luis Bettella.

ATTACHMENT / EXHIBIT A

4. Mr. Bettella was employed by Miami Parking Authority from December 12, 1989 until April 22, 2002. After initially working as a cashier, Mr. Bettella was trained and became certified as a parking enforcement officer.

5. On November 15, 2000, Mr. Bettella reported that he was injured on the job when a vehicle backed into him causing his right knee to be twisted. Mr. Bettella was cleared to return to work the following day, and he did not request any accommodations arising out of that injury. Mr. Bettella subsequently underwent rehabilitation in February 2001 and was released again to work full duty on March 30, 2001. During the time that Plaintiff was released to work with restrictions, Miami Parking Authority accommodated those restrictions and complied with the instructions of Mr. Bettella' s physicians.

6. From April 2001 to August 2001, Mr. Bettella did not request any light duty work or request any accommodations arising out of any injuries he sustained in the incident in November 2000.

7. On August 7, 2001, Mr. Bettella reported that he was involved in another on the job incident in which an individual kicked him causing him to fall to the ground. Mr. Bettella was released on light duty. Mr. Bettella submitted documents from his physician indicating that he could return to work on August 27, 2001. On August 28, 2001, Mr. Bettella's physician prepared another document indicating that Plaintiff could return to work on September 5, 2001 on light duty. Copies of the documents are attached hereto as Exhibit "1."

8. Mr. Bettella then initiated physical therapy. During that time, Miami Parking Authority provided Mr. Bettella with light duty work in accordance with his physician's instructions. Specifically, Mr. Bettella was given work in the office and not required to work as a parking enforcement officer in the field during that period of time.

9. In October 2001, Mr. Bettella provided a note from his physician that Mr. Bettella should minimize exposure to dust and mold due to an allergy. Prior to that time, Mr. Bettella indicated that he was sensitive to smoke and did not want to work next to individuals who smoked tobacco. Miami Parking Authority honored these requests.

10. On November 7, 2001, Mr. Bettella underwent arthroscopic knee surgery and was released on November 29, 2001 to light duty. Miami Parking Authority provided Mr. Bettella with light duty in accordance with his physician's instructions. On December 24, 2001, Mr. Bettella was released to work with other restrictions, which did not limit his ability to perform his job. His physician indicated that he could drive.

11. At Mr. Bettella's request, he was then permitted to recuperate at home. He was released by his orthopedic physician, Dr. Michael Reilly, with no restrictions on January 17, 2002. A copy of the document is attached hereto as "Exhibit 2." On February 7, 2002, Mr. Bettella obtained a second opinion from another orthopedic physician, Dr. Richard Kleiman, who also indicated that Mr. Bettella was able to return to work with no restrictions.

12. At no time after returning to full duty status in January 2002, did Mr. Bettella provide Miami Parking Authority with any written certification from any physician that he could not continue to work without restrictions or limitations. Additionally, at no time did Mr. Bettella request any accommodations from Miami Parking Authority.

13. At no time did anyone at Miami Parking Authority perceive Mr. Bettella as having a disability, which substantially limited his ability to perform his job functions. To the contrary, every effort was made by Miami Parking Authority to get Mr. Bettella back to work following his release by his physicians to full duty status.

14. At no time did Miami Parking Authority discriminate against Mr. Bettella due to any medical condition or disability.

15. I have personal knowledge of the facts stated herein.

**FURTHER AFFIANT SAYETH NAUGHT.**

SOCORRO PEREZ

CASE NO.: 03-21946 CIV-SEITZ/BANDSTRA

**I HEREBY CERTIFY** that on this day personally appeared before me, an officer duly authorized to administer oaths and take acknowledgements, **SOCORRO PEREZ**, who is personally known to me or who has produced N/A as identification and who under oath executed the foregoing instrument and acknowledged before me that she executed the same Affidavit freely and voluntarily for the purposes therein expressed.

WITNESS my hand and official seal at said County and State this 4 day of October, 2004.

Notary Public, State of Florida At Large

YANEI CRESPO
Print Name

My Commission Expires: March 16, 2007

Yanei Crespo
My Commission DD193791
Expires March 16 2007

RETURN TO WORK OR SCHOOL

KISHOR KARIA, M.D.
10011 Pines Blvd., Suite 105
Pembroke Pines, Fl 33024
Telephone: [redacted] 435-3333

Date: 8-28-01

This is to certify that Bastella Luis

has been under my care for the following:

Trauma (R) Knee

and is able to return to work / school on 9-5-01

Remarks: Light duty - 2 weeks from 9/5/01

(Signature)

RETURN TO WORK OR SCHOOL

KISHOR KARIA, M.D.
10011 Pines Blvd., Suite 105
Pembroke Pines, FL 33024
Telephone: [redacted] 435-3333

Date 8/20/01

This is to certify that Bettella Luis

has been under my care for the following:

(R) Knee Trauma

and is able to return to work / school on 8/27/01

Remarks

(Signature)

Pembroke Pines, August 29, 2001

Miami Parking Authority
Personnel Department
Attn.: Socorro Perez

Please note above my two (2) Out-of-Work Permission from my doctor, Dr. Karia. At present, I am receiving therapy from Workers Comp. I have an appointment today and Friday I have an appointment with Workers Comp Doctor. My following appointments with Workers Comp are not assigned yet. Pl,ease advise me what I have to do.

Louis Bettella

ATTACHMENT / EXHIBIT L

MICHAEL T. REILLY, M.D. & DAVID H. GILBERT, M.D.

PATIENT WORK STATUS FORM

Patient: BETTELLA, LUIS
Date: 12/24/01

Social Security No: 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
Claim No: 525919

RN Case Manager:
Phone No: 1-800-282-7644

Adjuster: KRISTA
Fax No: 863-667-1871

---

Diagnosis: (R) knee s/p arthroscopic surgery

Condition: [ ] Resolved [ ] Improving [ ] Unchanged [ ] Worsening

Surgery: [ ] None [ ] Scheduled Date: [✓] Completed Date: 11/7/01

Status:
- [✓] Return to work NO RESTRICTIONS — Date: 1/17/02
- [✓] Return to work WITH RESTRICTIONS — Date: 12/24/01
- [ ] Unable to work — Date:
- [ ] Anticipated return to work — Date:
- [ ] MMI ________ %

RATING GIVEN ACCORDING TO THE FOLLOWING:

- [ ] AMA Guide [ ] 1st [ ] 2nd [ ] 3rd [ ] 3rd ® — Section(s):
- [ ] Minnesota Guides — Section(s):
- [ ] 1993 FL Impairment Rating Guide — Section(s):
- [ ] 1996 FL Uniform Permanent Impairment Rating Sched — Section(s):

RESTRICTIONS:

- [ ] Left
- [✓] Right Knee
- [ ] Bilateral
- [ ] No use of hand or arm
- [ ] No repetitive pushing or pulling
- [ ] No overhead use
- [ ] No repetitive grasping
- [ ] Cast or splint required
- [ ] No repetitive twisting
- [✓] Weight limit 20 lbs
- [✓] Maximum hours daily 6 hrs
- [✓] No kneeling, bending, or squatting
- [ ] Sedentary only
- [ ] No climbing
- [ ] Unable to drive
- [ ] Cool indoor environment
- [✓] Other: May drive — 1 every hour of walking must have 10 minute break

Follow-up Appointment:

Physician Signature: M Reilly

[✓] Michael T. Reilly, M.D. [ ] David H. Gilbert, M.D.

ATTACHMENT / EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 03-21946 CIV-SEITZ/BANDSTRA

LUIS BETTELLA,

Plaintiff,

vs.

DEPARTMENT OF OFF-STREET PARKING OF THE CITY OF MIAMI, d/b/a MIAMI PARKING AUTHORITY,

Defendant.

_____________________________/

**AFFIDAVIT OF ANGELA HERNANDEZ**

**STATE OF FLORIDA )**
**) SS**
**COUNTY OF MIAMI-DADE)**

BEFORE ME, an officer duly authorized to take oaths and administer acknowledgements, personally appeared, ANGELA HERNANEZ, who, after first being duly sworn, did depose and say:

1. My name is Angela Hernandez. I am over the age of eighteen (18) years and I am competent to make this Affidavit.

2. At all times material hereto, I was employed by the Department of Off Street Parking for the City of Miami d/b/a Miami Parking Authority (" Miami Parking Authority") as Human Resources Director.

3. I have knowledge regarding the employment and termination of employment of Luis Bettella.

ATTACHMENT / EXHIBIT B

4. Mr. Bettella was employed by Miami Parking Authority from December 12, 1989 until April 22, 2002. After initially working as a cashier, Mr. Bettella was trained and became certified as a parking enforcement officer.

5. At all times material hereto, Miami Parking Authority had a written Discrimination Policy in place which prohibited discrimination and retaliation against any employees because of their race, religion, color, sex, age, nationality, origin, disability, marital or veteran status. A true and correct copy of the policy is attached hereto as Exhibit "1".

6. At all times material hereto, Miami Parking Authority had policies and procedures in place regarding discipline and sick leave. Pursuant to the sick leave policy, a copy of which is attached hereto and made a part hereof as Exhibit " 2", an employee taking 3 consecutive work days or more sick leave are required to submit documentation acceptable to the Miami Parking Authority. Violations of the sick leave policy could lead to disciplinary action, up to and including termination.

7. On November 15, 2000 and on August 7, 2001, Mr. Bettella reported that he sustained on the job injuries to his right knee. Miami Parking Authority complied with all of the requests from Mr. Bettella' s physicians regarding light duty and restrictions. Mr. Bettella was eventually cleared to return to work on full duty for these injuries.

8. Mr. Bettella's regular attendance was an essential function of his job. On February 20, 2002, Mr. Bettella received verbal counseling from his supervisor regarding excessive absenteeism following his return to work on full duty status. Mr. Bettella called in sick eight (8) times following his return to full duty. Even after counseling, Mr. Bettella missed the next two (2) days and then brought in a physicians note excusing him to be out of work until March 10, 2002. On March 16, 2002, Mr. Bettella called in sick again. Mr. Bettella had been out thirteen (13) days following being counseled on this issue. Mr. Bettella was advised that excessive absenteeism would result in further disciplinary action, including termination. A copy of the document is attached hereto as Exhibit "3." Mr. Bettella continued to violate the sick leave policy and received a written warning for excessive absenteeism on March 25, 2002. Mr. Bettella was suspended for three (3) days without pay and was again advised that excessive absenteeism would result in disciplinary action up

to and including termination. Copies of the documents are attached hereto as Exhibit "4".

9. As of March 24, 2002, Mr. Bettella had missed over fifteen (15) days and also missed two (2) days without calling his immediate supervisor in violation of the sick leave policy.

10. As a result of Mr. Bettella's failure and/or refusal to comply with the sick leave policy, Mr. Bettella was terminated on April 22, 2002. A copy of the termination letter is attached hereto and made a part hereof as Exhibit "5".

11. At no time after returning to full duty status in January 2002, did Mr. Bettella provide Miami Parking Authority with any written certification from any physician that he could not continue to work without restrictions or limitations. Additionally, at no time did Mr. Bettella request any accommodations from Miami Parking Authority.

12. At no time did anyone at Miami Parking Authority perceive Mr. Bettella as having a disability, which significantly impacted upon his ability to perform his job functions. To the contrary, every effort was made by Miami Parking Authority to get Mr. Bettella back to work following his release by his physicians to full duty status.

13. At no time did Miami Parking Authority discriminate against Mr. Bettella due to any medical condition or disability. The termination decision was based solely on Mr. Bettella's repeated failure to comply with the sick leave policy and had nothing to do with any alleged disability.

14. I have personal knowledge of the facts stated herein.

FURTHER AFFIANT SAYETH NAUGHT.

ANGELA HERNANDEZ

CASE NO.: 03-21946 CIV-SEITZ/BANDSTRA

**I HEREBY CERTIFY** that on this day personally appeared before me, an officer duly authorized to administer oaths and take acknowledgements, **ANGELA HERNANDEZ**, who is personally known to me or who has produced N/A as identification and who under oath executed the foregoing instrument and acknowledged before me that she executed the same Affidavit freely and voluntarily for the purposes therein expressed.

WITNESS my hand and official seal at said County and State this 4 day of October, 2004.

Notary Public, State of Florida At Large

Yanei Crespo
My Commission DD193791
Expires March 16, 2007

YANEI CRESPO
Print Name

My Commission Expires: March 16, 2007

# MIAMI PARKING SYSTEM

| PERSONNEL POLICIES & PROCEDURES | Policy No.: A-7<br>Issued Date: February 1995<br>Revised Date(s): 11/96<br>Page 1 of 1 |
|---|---|
| Approvals: | |

## EQUAL EMPLOYMENT OPPORTUNITY

**Policy:**

It is the policy of the Agency to provide equal opportunity employment to all employees and applicants for employment. No person working for the Agency is to be discriminated against in employment because of race, religion, color, sex, age, national origin, disability, HIV/AIDS, pregnancy or pregnancy-related conditions, marital or veteran status.

Furthermore, it is the Agency's policy to comply with all federal, state and local laws regarding equal employment. The Agency will continue the practice of informing employees, managers and applicants of the Agency's nondiscrimination policy. The Agency is committed to the principles of nondiscrimination and affirmative action. Additionally, recruitment advertisements, employment applications and job postings will include the statement, "Equal Opportunity Employer".

**Comment:**

1. This policy applies to all terms, conditions, and privileges of employment including, but not limited to, hiring, training and development, promotion, transfer, compensation, benefits, educational assistance, layoff and recall, social and recreational programs, employee facilities, termination, and retirement.

2. Adhering to this policy, the Agency has established an Affirmative Action Program to demonstrate the Agency's commitment and to achieve prompt and full utilization of minorities, the disabled, and women at all levels and in all segments of the workforce. The results of the program are to be reviewed quarterly, and the program is to be modified as necessary to achieve its stated objectives.

3. The Director of Human Resources is responsible for formulating, implementing, coordinating, and monitoring all efforts in the area of Equal Employment Opportunity.

4. Any communication from an applicant for employment, an employee, a government agency, or an attorney concerning an equal employment opportunity matter is to be referred to the Director of Human Resources.

ATTACHMENT / EXHIBIT 1

# MIAMI PARKING SYSTEM

| PERSONNEL POLICIES & PROCEDURES | Policy No.: C-4<br>Issued Date: June 1994<br>Revised Date(s): 6/94, 10/96<br>Page 1 of 3 |
|---|---|

Approvals:

## SICK LEAVE

**Policy:**

It is the policy of the Miami Parking System to provide paid sick leave to full and certain part-time employees in accordance to the guidelines established below.

**Comment:**

1) Full time employees will accrue paid sick leave at a rate of twelve (12) working days of sick leave with pay per calendar year. Employees earn sick leave with pay on the basis of one day for each full month of employment. Employees hired prior to the fifteenth (15) of the month will receive credit for the full month. Employees hired after the fifteenth (15) of the month will begin accruing sick leave the following month.

2) Part-time, regular-status employees working thirty (30) hours or more per week will accrue sick leave at a rate of six (6) paid sick days annually. Such employees earn sick leave at the rate of four (4) hours per month.

3) Unused sick leave with pay which is not converted to vacation days (see 13 below) is cumulative from year to year. There is no limit on the amount of sick leave that may be accumulated.

4) Sick leave taken in excess of twelve (12) days in any calendar year or three (3) consecutive days should be reported by the immediate supervisor to the Department Director.

5) Any employee taking three consecutive workdays or more of sick leave must submit documentation acceptable to the Agency to his/her supervisor.

6) When an employee has used all accumulated paid sick leave and is still unable to work, the excess time absent will automatically be charged against vacation leave.

7) An employee will be granted paid sick leave to care for a spouse, dependent child, or parent who is ill.

ATTACHMENT / EXHIBIT 2

# MIAMI PARKING SYSTEM

| PERSONNEL POLICIES & PROCEDURES | Policy No.: C-4<br>Issued Date: June 1994<br>Revised Date(s): 6/94, 10/96<br>Page 2 of 3 |
|---|---|
| Approvals: | |

8) In order to receive compensation while absent on sick leave, the employee must notify the immediate supervisor of the illness as much in advance as possible, and no later than thirty (30) minutes after the time set for the employee's regularly scheduled starting time. Any employee who does not contact their supervisor by the time specified above, excluding life-threatening or urgent care situations, may be penalized one day's pay. Each employee is required to advise the Agency as soon as the employee realizes that he/she is unable to work. Each employee must call in personally to report the absence unless the absence is an extreme emergency. If the supervisor is not available, the department head should be contacted.

9) Any injury, surgery, or illness of a serious nature, causing an absence, may be verified by an Agency approved physician at the discretion of the Agency before the employee returns to work.

10) All employees requesting sick leave must complete a leave application for each sick leave occurrence. If three consecutive days of ill time are taken, the doctor's note should be attached to the leave application.

11) All unused sick leave shall be compensated for at the time of retirement by payment of each day of such unused sick leave up to a maximum of 120 days of sick leave as prorated below:

> Employees with ten or more years of service who terminated employment under honorable conditions shall receive a cash payment equal to one-fourth of their unused accumulated sick leave.
>
> Employees with fifteen or more years service who terminate employment under honorable conditions shall receive payment equal to one half of their unused accumulated sick leave.

12) The Agency will reward employees for good attendance by converting up to a maximum of six (6) unused accrued sick days for each Fiscal Year to the employee's vacation accrual. Full-time employees accrue twelve (12) sick days each year and are eligible to convert six (6) unused sick days to vacation leave. All sick time taken in the fiscal year is first substracted from the six (6) days which are eligible for conversion. The resulting balance of the first six days then becomes the amount that is added to the employee's current vacation balance. If the employee uses all of his first

# MIAMI PARKING SYSTEM

| PERSONNEL POLICIES & PROCEDURES | Policy No.: C-4<br>Issued Date: June 1994<br>Revised Date(s): 6/94, 10/96<br>Page 3 of 3 |
|---|---|
| Approvals: | |

six days earned in a fiscal year, no amount is credited to the employee's vacation balance. This conversion will occur at the end of the fiscal year of each year. The actual "cut-off" date will coincide with the last day of the last pay period of the month. (For example, if the last pay period in the fiscal year is September 15 through September 28, the "cut-off" date will be September 28.)

(Example: John Doe accrues twelve (12) sick days. He has been sick five (5) days in the Fiscal year. Since he has a maximum of six (6) sick days to convert, and he has used five (5) days, the amount credited to his vacation accrual is one (1) day). Part-time employees who work thirty (30) hours or more are eligible to convert up to a maximum of three unused sick days (3) days in a fiscal year. If the part-time employee who works 30 hours or more uses all of his first three days earned in a fiscal year, no amount is credited to his vacation balance.

13) Employees joining or leaving the Agency during the year will receive the conversion of sick leave to vacation in a pro rata basis. For example, if a full-time employee joins the Agency on April 1st, on September 30th, one-half of his sick leave earned (ie. three days) is eligible for conversion. Any sick leave taken is charged first against those days eligible for conversion.

14) During an employee's approved sick leave, the employee will continue to be entitled to full benefits, including sick and vacation leave accruals.

Miami Parking Authority

**To:** Luis Bettella

**From:** Humberto Escandon, Enforcement Supervisor

**Date:** 03/20/02

**Re:** Excessive Absenteeism

On Friday February 22, 2002 you were verbally counseled for your excessive absenteeism. In a month you call in sick 8 times, this was after you returned back to work on full duty status. On February 23 & 24, 2002 you called in sick again. After these two days you brought a doctor note from Dr. Kishor Karia, M.D excusing you to be out of work until March 10,2002. On March 16,2002 you called in sick again. Since you were counseled on this matter, you have been out another 13 times.

This conduct demonstrates lack of responsibility on your part. Should an incident of this nature occur in the future, further disciplinary action will take place, up to an including termination.

CC: Angel Diaz On-Street Manager

ATTACHMENT / EXHIBIT 3

# DISCIPLINARY ACTION RECORD

F/i

EMPLOYEE: LUIS BETTELLA JOB CLASSIFICATION: Parking Enforcement

DESCRIPTION (SEE ATTACHED EXCESSIVE ABSENTEEISM MEMO)

[✓] Verbal Warning [ ] Written Warning [ ] Suspension for

Supervisor's Additional Comments:

Employee's Comments:

I WAS NEVER HARASS IN THIS WAY - every day I missed or leaved earlier was only because I was not able to move (due to the pain in both legs, ~~[illegible]~~ side). I will attached in a few days a more detail letter, Someone is responsable for this, not me.

Supervisor [signature] Date 3/20/02 Employee's Signature [signature] (very upset)

(Signature indicates that this document was read)

This record will be included in your personnel file. The issuance of further disciplinary actions may subject you to additional corrective action, up to and including termination. Verbal warnings will be removed from your file after 12 months but retained in a separate file, if the misconduct does not recur.

Original/Employee Yellow/HR Pink/Supervisor

MIAMI PARKING AUTHORITY

# Memo

**To:** Luis Bettella, Enforcement Officer

**From:** Gilda Ferrer, Enforcement Supervisor *Gilda Ferrer*

**CC:** Angel Diaz, On-Street Manager

**Date:** 03/25/02

**Re:** Written Disciplinary Action/Excessive Absenteeism

On Wednesday, March 20, 2002, your were given a Verbal Disciplinary Action for excessive absenteeism. On Friday, March 22, 2002, you called in sick. On Sunday, March 24, 2002, you also called in sick. Mr. Bettella you have violated policy and procedures of the Agency. Continuous absenteeism constitutes unsatisfactory performance.

Therefore, at this time you are receiving a Written Disciplinary Action along with three days suspension without pay for excessive absenteeism. Should an incident of this nature occur in the future, further disciplinary action will take place, up to and including termination.

ATTACHMENT / EXHIBIT 4

# DISCIPLINARY ACTION RECORD

EMPLOYEE: Luis Bettella JOB CLASSIFICATION: Enforcement Off.

DESCRIPTION:

See attached Memorandum.

[ ] Verbal Warning [ ] Written Warning [✓] Suspension for Excessive Absenteeism

Supervisor's Additional Comments:

Employee's Comments:

Supervisor 3/28/02 Date Employee's Signature
(Signature indicates that this document was read)

This record will be included in your personnel file. The issuance of further disciplinary actions may subject you to additional corrective action, up to and including termination. Verbal warnings will be removed from your file after 12 months but retained in a separate file, if the misconduct does not recur.

Distribution: Original/Employee Yellow/HR Pink/Supervisor

Arthur Noriega, V.
Executive Director

190 N.E. 3rd Street
Miami Florida, FL 33132

Phone (305) 373-6789
Fax (305) 371-9451

www.miamiparking.com

Miami Parking Authority

April 22, 2002

Luis Battella
631 SW 100 Terr.
P.B. Pembroke Pines FL 33025

Dear Mr. Battella:

On January 17, 2002 your physician regarding your knee injury cleared you to full duty status. You were cleared once again by another physician on March 07, 2002. Since you were cleared for duty in January you have had an unsatisfactory amount of absentees.

- On February 22, 2002 you were verbally counseled for your severe attendance problem.
- On March 16, 2002 you were issued a verbal warning do to the fact that your attendance problem did not improve.
- On March 22, 2002 you were once again counseled for your excessive absences. A written warning along with a three-day suspension was given to you.
- Since March 24 you have missed over 15 days and missed two days without calling your immediate supervisor.
- Mr. Battella you have been given various warnings and have failed to improve your unsatisfactory attendance record.

Since you have failed to improve your attendance record and violated agency policy on two separate occasions by not calling or showing up to work, it is determined that your employment with the Miami Parking Authority is terminated immediately. Please return all agencies issued equipment.

Sincerely,

Jeffrey Thompson
Director of Operations

cc Humberto Escandon
Angel Diaz
Angela Hernandez

ATTACHMENT / EXHIBIT 5

# MIAMI PARKING SYSTEM

| PERSONNEL POLICIES & PROCEDURES | Policy No.: A-7<br>Issued Date: February 1995<br>Revised Date(s): 11/96<br>Page 1 of 1 |
|---|---|

Approvals:

## EQUAL EMPLOYMENT OPPORTUNITY

**Policy:**

It is the policy of the Agency to provide equal opportunity employment to all employees and applicants for employment. No person working for the Agency is to be discriminated against in employment because of race, religion, color, sex, age, national origin, disability, HIV/AIDS, pregnancy or pregnancy-related conditions, marital or veteran status.

Furthermore, it is the Agency's policy to comply with all federal, state and local laws regarding equal employment. The Agency will continue the practice of informing employees, managers and applicants of the Agency's nondiscrimination policy. The Agency is committed to the principles of nondiscrimination and affirmative action. Additionally, recruitment advertisements, employment applications and job postings will include the statement, "Equal Opportunity Employer".

**Comment:**

1. This policy applies to all terms, conditions, and privileges of employment including, but not limited to, hiring, training and development, promotion, transfer, compensation, benefits, educational assistance, layoff and recall, social and recreational programs, employee facilities, termination, and retirement.

2. Adhering to this policy, the Agency has established an Affirmative Action Program to demonstrate the Agency's commitment and to achieve prompt and full utilization of minorities, the disabled, and women at all levels and in all segments of the workforce. The results of the program are to be reviewed quarterly, and the program is to be modified as necessary to achieve its stated objectives.

3. The Director of Human Resources is responsible for formulating, implementing, coordinating, and monitoring all efforts in the area of Equal Employment Opportunity.

4. Any communication from an applicant for employment, an employer, a government agency, or an attorney concerning an equal employment opportunity matter is to be referred to the Director of Human Resources.

ATTACHMENT / EXHIBIT C

# MIAMI PARKING SYSTEM

| PERSONNEL POLICIES & PROCEDURES | Policy No.: C-4<br>Issued Date: June 1994<br>Revised Date(s): 6/94, 10/96<br>Page 1 of 3 |
|---|---|

Approvals:

## SICK LEAVE

**Policy:**

It is the policy of the Miami Parking System to provide paid sick leave to full and certain part-time employees in accordance to the guidelines established below.

**Comment:**

1) Full time employees will accrue paid sick leave at a rate of twelve (12) working days of sick leave with pay per calendar year. Employees earn sick leave with pay on the basis of one day for each full month of employment. Employees hired prior to the fifteenth (15) of the month will receive credit for the full month. Employees hired after the fifteenth (15) of the month will begin accruing sick leave the following month.

2) Part-time, regular-status employees working thirty (30) hours or more per week will accrue sick leave at a rate of six (6) paid sick days annually. Such employees earn sick leave at the rate of four (4) hours per month.

3) Unused sick leave with pay which is not converted to vacation days (see 13 below) is cumulative from year to year. There is no limit on the amount of sick leave that may be accumulated.

4) Sick leave taken in excess of twelve (12) days in any calendar year or three (3) consecutive days should be reported by the immediate supervisor to the Department Director.

5) Any employee taking three consecutive workdays or more of sick leave must submit documentation acceptable to the Agency to his/her supervisor.

6) When an employee has used all accumulated paid sick leave and is still unable to work, the excess time absent will automatically be charged against vacation leave.

7) An employee will be granted paid sick leave to care for a spouse, dependent child, or parent who is ill.

ATTACHMENT / EXHIBIT D

# MIAMI PARKING SYSTEM

| PERSONNEL POLICIES & PROCEDURES | Policy No.: C-4<br>Issued Date: June 1994<br>Revised Date(s): 6/94, 10/96<br>Page 2 of 3 |
|---|---|
| Approvals: | |

8) In order to receive compensation while absent on sick leave, the employee must notify the immediate supervisor of the illness as much in advance as possible, and no later than thirty (30) minutes after the time set for the employee's regularly scheduled starting time. Any employee who does not contact their supervisor by the time specified above, excluding life-threatening or urgent care situations, may be penalized one day's pay. Each employee is required to advise the Agency as soon as the employee realizes that he/she is unable to work. Each employee must call in personally to report the absence unless the absence is an extreme emergency. If the supervisor is not available, the department head should be contacted.

9) Any injury, surgery, or illness of a serious nature, causing an absence, may be verified by an Agency approved physician at the discretion of the Agency before the employee returns to work.

10) All employees requesting sick leave must complete a leave application for each sick leave occurrence. If three consecutive days of ill time are taken, the doctor's note should be attached to the leave application.

11) All unused sick leave shall be compensated for at the time of retirement by payment of each day of such unused sick leave up to a maximum of 120 days of sick leave as prorated below:

Employees with ten or more years of service who terminated employment under honorable conditions shall receive a cash payment equal to one-fourth of their unused accumulated sick leave.

Employees with fifteen or more years service who terminate employment under honorable conditions shall receive payment equal to one half of their unused accumulated sick leave.

12) The Agency will reward employees for good attendance by converting up to a maximum of six (6) unused accrued sick days for each Fiscal Year to the employee's vacation accrual. Full-time employees accrue twelve (12) sick days each year and are eligible to convert six (6) unused sick days to vacation leave. All sick time taken in the fiscal year is first substracted from the six (6) days which are eligible for conversion. The resulting balance of the first six days then becomes the amount that is added to the employee's current vacation balance. If the employee uses all of his first

# MIAMI PARKING SYSTEM

| PERSONNEL POLICIES & PROCEDURES | Policy No.: C-4<br>Issued Date: June 1994<br>Revised Date(s): 6/94, 10/96<br>Page 3 of 3 |
|---|---|
| Approvals: | |

six days earned in a fiscal year, no amount is credited to the employee's vacation balance. This conversion will occur at the end of the fiscal year of each year. The actual "cut-off" date will coincide with the last day of the last pay period of the month. (For example, if the last pay period in the fiscal year is September 15 through September 28, the "cut-off" date will be September 28.)

(Example: John Doe accrues twelve (12) sick days. He has been sick five (5) days in the Fiscal year. Since he has a maximum of six (6) sick days to convert, and he has used five (5) days, the amount credited to his vacation accrual is one (1) day). Part-time employees who work thirty (30) hours or more are eligible to convert up to a maximum of three unused sick days (3) days in a fiscal year. If the part-time employee who works 30 hours or more uses all of his first three days earned in a fiscal year, no amount is credited to his vacation balance.

13) Employees joining or leaving the Agency during the year will receive the conversion of sick leave to vacation in a pro rata basis. For example, if a full-time employee joins the Agency on April 1st, on September 30th, one-half of his sick leave earned (ie. three days) is eligible for conversion. Any sick leave taken is charged first against those days eligible for conversion.

14) During an employee's approved sick leave, the employee will continue to be entitled to full benefits, including sick and vacation leave accruals.

RETURN TO WORK OR SCHOOL

KISHOR KARIA, M.D.
10011 Pines Blvd., Suite 106
Pembroke Pines, FL 33024
Telephone: [redacted] 435 3333

Date 8-28-01

This is to certify that Bettella Luis
has been under my care for the following:
Trauma (R) Knee

and is able to return to work/school on 9-5-01

Remarks:
Light duty - duty from 9/5/01

(Signature)

RETURN TO WORK OR SCHOOL

KISHOR KARIA, M.D.
10011 Pines Blvd., Suite 106
Pembroke Pines, FL 33024
Telephone: [redacted] 435 3333

Date 8/20/01

This is to certify that Bettella Luis
has been under my care for the following:
(R) Knee Trauma

and is able to return to work/school on 8/27/01

Remarks:

(Signature)

Pembroke Pines, August 29, 2001

Miami Parking Authority
Personnel Department
Attn.: Socorro Perez

Please note above my two (2) Out-of-Work Permission from my doctor, Dr. Karia. At present, I am receiving therapy from Workers Comp. I have an appointment today and Friday I have an appointment with Workers Comp Doctor. My following appointments with Workers Comp are not assigned yet. Pl,ease advise me what I have to do.

Louis Bettella

ATTACHMENT / EXHIBIT E

MICHAEL T. REILLY, M.D. & DAVID H. GILBERT, M.D.

PATIENT WORK STATUS FORM

| | | | |
|---|---|---|---|
| Patient: | BETTELLA, LUIS | Date: | 12/24/01 |
| Social Security No: | 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 | Claim No: | 525919 |
| RN Case Manager: | | Phone No: | 1-800-282-7644 |
| Adjuster: | KRISTA | Fax No: | 863-667-1871 |

Diagnosis: (R) knee s/p arthroscopic surgery

Condition: [ ] Resolved [ ] Improving [ ] Unchanged [ ] Worsening

Surgery: [ ] None [ ] Scheduled Date: ____ [✓] Completed Date: 11/7/01

Status:
- [✓] Return to work NO RESTRICTIONS — Date: 1/17/02
- [✓] Return to work WITH RESTRICTIONS — Date: 12/24/01
- [ ] Unable to work — Date: ____
- [ ] Anticipated return to work — Date: ____
- [ ] MMI ____ %

RATING GIVEN ACCORDING TO THE FOLLOWING:
- [ ] AMA Guide [ ] 1st [ ] 2nd [ ] 3rd [ ] 3rd® — Section(s): ____
- [ ] Minnesota Guides — Section(s): ____
- [ ] 1993 FL Impairment Rating Guide — Section(s): ____
- [ ] 1996 FL Uniform Permanent Impairment Rating Sched — Section(s): ____

RESTRICTIONS:
- [ ] Left ____ [✓] Right knee [ ] Bilateral
- [ ] No use of hand or arm
- [ ] No overhead use
- [ ] Cast or splint required
- [✓] Weight limit 20 lbs
- [✓] No kneeling, bending, or squatting
- [ ] No climbing
- [ ] Cool indoor environment
- [ ] No repetitive pushing or pulling
- [ ] No repetitive grasping
- [ ] No repetitive twisting
- [✓] Maximum hours daily 6 hrs
- [ ] Sedentary only
- [ ] Unable to drive
- [✓] Other: May drive - every hour of walking must have 10 minute break

Follow-up Appointment: ____ / ____ / ____

Physician Signature: [signature]

[✓] Michael T. Reilly, M.D. [ ] David H. Gilbert, M.D.

ATTACHMENT / EXHIBIT F

Miami Parking Authority

**To:** Luis Bettella

**From:** Humberto Escandon, Enforcement Supervisor

**Date:** 03/20/02

**Re:** Excessive Absenteeism

On Friday February 22, 2002 you were verbally counseled for your excessive absenteeism. In a month you call in sick 8 times, this was after you returned back to work on full duty status. On February 23 & 24, 2002 you called in sick again. After these two days you brought a doctor note from Dr. Kishor Karia, M.D excusing you to be out of work until March 10,2002. On March 16,2002 you called in sick again. Since you were counseled on this matter, you have been out another 13 times.

This conduct demonstrates lack of responsibility on your part. Should an incident of this nature occur in the future, further disciplinary action will take place, up to an including termination.

**CC:** Angel Diaz On-Street Manager

ATTACHMENT / EXHIBIT G

ATTACHMENT

# DISCIPLINARY ACTION RECORD

F/i

EMPLOYEE: LUIS BETTELLA JOB CLASSIFICATION: Parking Enforcement

DESCRIPTION (SEE ATTACHED EXCESSIVE ABSENTEEISM MEMO)

[✓] Verbal Warning [ ] Written Warning [ ] Suspension for

Supervisor's Additional Comments:

Employee's Comments:

I WAS NEVER HARASS IN THIS WAY - every day I missed or leaved earlier was only because I was not able to move (due to the pain in both legs ~~injured~~ ankle). I will attached in a few days a more detail letter. Someone is responsible for this - not me.

[signature] 3/20/02 [signature] (very upset)

Supervisor Date Employee's Signature

(Signature indicates that this document was read)

This record will be included in your personnel file. The issuance of further disciplinary actions may subject you to additional corrective action, up to and including termination. Verbal warnings will be removed from your file after 12 months but retained in a separate file, if the misconduct does not recur.

Original/Employee Yellow/HR Pink/Supervisor

Miami Parking Authority

**To:** Luis Bettella

**From:** Humberto Escandon, Enforcement Supervisor

**Date:** 03/20/02

**Re:** Excessive Absenteeism

On Friday February 22, 2002 you were verbally counseled for your excessive absenteeism. In a month you call in sick 8 times, this was after you returned back to work on full duty status. On February 23 & 24, 2002 you called in sick again. After these two days you brought a doctor note from Dr. Kishor Karia, M.D excusing you to be out of work until March 10,2002. On March 16,2002 you called in sick again. Since you were counseled on this matter, you have been out another 13 times.

This conduct demonstrates lack of responsibility on your part. Should an incident of this nature occur in the future, further disciplinary action will take place, up to an including termination.

**CC:** Angel Diaz On-Street Manager

ATTACHMENT / EXHIBIT H

# DISCIPLINARY ACTION RECORD

EMPLOYEE: LUIS BETTELLA JOB CLASSIFICATION: Parking Enforcement F/i

DESCRIPTION (SEE ATTACHED EXCESSIVE ABSENTEEISM MEMO)

[x] Verbal Warning [ ] Written Warning [ ] Suspension for

Supervisor's Additional Comments:

Employee's Comments:

I WAS NEVER HARASS IN THIS WAY - every day I missed or leaved earlier was only because I was not able to move (due to the pain in both legs [illegible]). I will attached in a few days a more detail letter. Someone is responsible for this - not me.

3/20/02

Supervisor Date Employee's Signature (very upset)

(Signature indicates that this document was read)

This record will be included in your personnel file. The issuance of further disciplinary actions may subject you to additional corrective action, up to and including termination. Verbal warnings will be removed from your file after 12 months but retained in a separate file, if the misconduct does not recur.

Original/Employee Yellow/HR Pink/Supervisor

Arthur Noriega, V.
Executive Director

190 N.E. 3rd Street
Miami Florida, FL 33132

Phone (305) 373-6789
Fax (305) 371-9451

www.miamiparking.com

Miami Parking Authority

April 22, 2002

Luis Battella
631 SW 100 Terr.
L.B. Pembroke Pines FL.33025

Dear Mr. Battella:

On January 17, 2002 your physician regarding your knee injury cleared you to full duty status. You were cleared once again by another physician on March 07, 2002. Since you were cleared for duty in January you have had an unsatisfactory amount of absentees.

- On February 22, 2002 you were verbally counseled for your severe attendance problem.
- On March 16, 2002 you were issued a verbal warning do to the fact that your attendance problem did not improve.
- On March 22, 2002 you were once again counseled for your excessive absences. A written warning along with a three-day suspension was given to you.
- Since March 24 you have missed over 15 days and missed two days without calling your immediate supervisor.
- Mr. Battella you have been given various warnings and have failed to improve your unsatisfactory attendance record.

Since you have failed to improve your attendance record and violated agency policy on two separate occasions by not calling or showing up to work, it is determined that your employment with the Miami Parking Authority is terminated immediately. Please return all agencies issued equipment.

Sincerely,

Jeffrey Thompson
Director of Operations

cc: Humberto Escandon
Angel Diaz
Angela Hernandez

ATTACHMENT / EXHIBIT I

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

AGENCY
☐ FEPA
☒ EEOC

CHARGE NUMBER
150A300216

MDEOB, Fla. Comm on Human Relations and EEOC

*State or Local Agency if any*

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Mr. Luis Bettella | (954) 432-2009 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 631 S.W. 100th Terr. | Pembroke Pines, FL 33025 | 2/4/56 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATES AGAINST ME (*If more than one, list below*)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include area code) |
|---|---|---|
| Miami Parking Authority | 50+ | (305) 373-6789 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 190 N.E. 3rd Street | Miami, Fl 33132 | Dade |

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (include area code) |
|---|---|---|
| | | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☐ RETALIATION ☐ AGE ☒ DISABILITY ☐ OTHER (specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST
LATEST 4/22/02
☒ CONTINUING ACTION

THE PARTICULARS ARE (*If additional space is needed, attach extra sheet (s)*):

1. I was employed by the above named Respondent from approximately 1990 until April 22, 2002. I am a qualified individual with a disability. The respondent had knowledge of my disability.

2. By letter dated April 22, 2002, I was advised that I was being terminated effective immediately.

3. I believe that my disability was a motivating factor in reference to the decision to terminate me.

4. Furthermore, I requested numerous accommodations for my disability to allow me to work. The above named respondent refused to provide me with the accommodations to allow me to perform my job duties.

5. Alternatively, I believe that I was discriminated against based on a "perceived disability" because the respondent regarded me as having a disability.

6. As a result of the foregoing, I feel I have been discriminated against on the basis of disability and/or "perceived disability" in violation of the Americans With Disabilities Act, as well as State and Local laws.

ATTACHMENT / EXHIBIT J

I want this charge filed with both the EEOC and the State or Local agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

Date 10/07/02 Charging Party (*signature*)

NOTARY - (When necessary for ...)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Month, day and year)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# DISMISSAL AND NOTICE OF RIGHTS

To: Louis 6. Bettella
631 S.W. 100 Terrance
Pembroke Pines, FL 33025

From: Miami District Office
2 South Biscayne Blvd
Suite 2700
Miami, FL 33131

☐ On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR § 1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 150-2003-00216 | George W. Ruggiano, Investigator | (305) 536-5580 |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

- ☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.
- ☒ Your allegations did not involve a disability as defined by the Americans with Disabilities Act.
- ☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.
- ☐ Your charge was not timely filed with EEOC, in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.
- ☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.
- ☐ While reasonable efforts were made to locate you, we were not able to do so.
- ☐ You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.
- ☐ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.
- ☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.
- ☐ Other *(briefly state)*

## - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this Notice**, or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

Federico Costales, Director

APR 25 2003
*(Date Mailed)*

Enclosure(s)

cc: Human Resources Sir/Madam
MIAMI PARKING AUTHORITY
190 N.E. 3rd Street
Miami, FL 33132

Teri G. Valdes, Esq.
Kendar Executive Center
1550 Madruga Avenue, Suite 323
Coral Gables, FL 33146

ATTACHMENT / EXHIBIT K